BRADFORD *v.* ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAIL-
WAY COMPANY.

Opinion delivered January 10, 1910.

1. CARRIERS—SEPARATE COACH LAW—CONSTRUCTION.—Kirby's Digest, § §
    6622-32, requiring railway companies to provide "equal but separate
    and sufficient accommodations for the white and African races," does
    not prohibit a railroad company, after a passenger has been assigned
    a seat in a car set apart for his race, from subsequently making a new
    assignment of cars and causing such passenger to move to another
    car assigned to his race. (Page 249.)

2. SAME—SEPARATE COACH—RIGHT TO EJECT PASSENGER.—A white passen-
    ger who, on being ordered to move from a coach assigned to mem-
    bers of the colored race, refuses to obey the directions of the con-
    ductor may be forcibly removed therefrom. (Page 249.)

3. SAME—REGULATIONS AS TO SEPARATE COACHES.—Railroad companies
    may, in the absence of a statute, make reasonable regulations for the
    separation of the two races, observing the condition of equality of
    accommodations. (Page 250.)

Appeal from Lonoke Circuit Court; *Eugene Lankford,*
Judge; affirmed.

STATEMENT BY THE COURT.

October 30, 1908, appellant filed complaint in the Lonoke
Circuit Court against the St. Louis, Iron Mountain & Southern
Railway Company, charging that, while he was a passenger on
the defendant's train, the conductor "recklessly, maliciously and
unlawfully struck and choked said plaintiff," and that the con-
ductor and the porter and the brakeman again assaulted him,
beat him upon the head, cursed, choked and threatened to kill
him. Damages were asked in the sum of $1,900 actual dam-
ages, and $500 punitive damage.

The answer of the defendant denied that the conductor or
other employee recklessly, wilfully and maliciously assaulted
appellant, and denied that any of them cursed him; alleged that
defendant seated himself in a coach designated for colored pas-
sengers, and that the conductor requested him to enter a coach
for white passengers; that appellant refused to do so, and as-
serted the intention of remaining in the coach assigned to the
colored passengers; that the conductor removed him, using only
such force as was necessary. It also claimed that appellant was

drunk and disorderly, and denied that plaintiff was entitled to any damages.

John Bradford took passage on appellee's train at Argenta for Jacksonville, another station not far distant. He took his seat in the "smoker," a car with two compartments. One of these where appellant seated himself was designated for "white" people. Bradford appeared to be under the influence of liquor. Twenty-five or thirty colored passengers boarded the train at Argenta. There was not room in the colored compartment for them, and in a few minutes after the train pulled out from Argenta they went into the compartment of the smoker where appellant and other white passengers were. Immediately thereafter the conductor also went into the compartment where appellant and others were and told the white passengers that he needed the "smoker" for the accommodation of the negroes, and requested the white passengers to go back into the rear car. There was a "deadhead" pullman car where all the white passengers could be seated. All "seemed to go" except appellant. He said he would not give up his seat to a negro, called upon his friends to stand by him, and refused to comply with the request of the conductor. The conductor tried to persuade him to go, but he refused with an oath, telling the conductor that if he wanted him out of there he would have to put him out. The conductor, whose version of the matter the jury accepted, testified as to the manner of appellant's expulsion as follows: "I took my coat off, and took him back to the sleeper. Mr. Bradford ran his hand in his hip pocket, and I grabbed his throat with my left hand and choked him, and he commenced to nod like that, and I took him and led him back like a little man. I laid my hands on his shoulders, and walked behind him. I went back to see that he had a seat; and I seated him in the Pullman, on the right hand side of the car, facing north. I did not strike him with my fist, or kick him. I took him by the throat to protect myself, when he put his hand in his pocket. I thought he was going for a knife or a gun. When I saw him do that, I did take him by the throat; and I did it to resist whatever assault he might make on me. The porter did not kick Bradford. He didn't have his hands on him. The brakeman did not strike him, or beat him, or kick him. He wasn't even in the car."

The conductor further testified as follows: "It is the rule

of the company to seat the colored passengers in the front and to use the rear end for the white passengers. If it becomes necessary in order to accommodate passengers, we go and request the white people to vacate that partition car and take seats in other parts of the train. The rule of the company gives the conductor the right to force white people to go out and let negroes in there while the train is going, if it becomes necessary, even though when they had taken their seats in there it was assigned and designated for white people. We have no rule which requires us to see that no one goes from one car to another, while the same is in motion. We are supposed to keep them from riding on the platform; but it is not particularly dangerous to pass from one car to the other because you are in motion. Under our rule we have a right to move passengers from one car to another, in order to give all passengers a seat, and we can do that while the train is going along. In order to comply with the laws of the State as to separate cars for white and black passengers, we have a right to move the white passengers from a car where they have taken their seats, if it becomes necessary to use that car to seat black passengers. And if they refuse to leave it we have a right to eject them from the coach. There was no sign in this car, but it was usually used as a smoking car for white passengers. At the time I asked the gentlemen to vacate, the auditor had not been around and taken up fare. I don't think he had. I acted under rule 338 and seated the passengers in the sleeper. We can take any one back out of the train and seat them in the Pullman car during the day without extra charge. The train conductor is superior to the Pullman conductor, and has that right. I had control over that car that day. I wasn't authorized to use that car, except when cases arise to use it. It was a deadhead car, and belonged to the Pullman Company."

The rule 338 was read and is as follows: "Should there not be sufficient sitting room in the coaches during the day to accommodate all of the passengers, and should there be a sleeping car attached to the train in which there are vacant seats, the conductor may seat some of the passengers in the sleeping car, noting on his report the number of passengers placed in such car and the stations to and from which they travel. This should not be done when passengers in the sleeping car have retired or

to such an extent as to discommode regular sleeping car passengers."

The conductor continued his testimony as follows: "My understanding of the rule is that whenever it becomes necessary I can change the assignment of passengers from one coach to the other in order to comply with the law. As I understand it, we must provide seats for all passengers; and if I haven't enough room in the colored car for all colored passengers, I can request the other people to vacate that car." There was other testimony tending to corroborate the testimony of the conductor. The above testimony was introduced over appellant's objection. The grounds of his objections are:

1st. That there was error in permitting witness Hunter to testify that it was his duty to eject the white passengers from the smoking compartment of the car assigned and set apart to white passengers while the train was in motion. 2d. That he had the power and right to use the white smoker for colored passengers when the compartment set apart to them was not sufficient to seat them; and, 3d, that he had the right to eject a white passenger from the smoking compartment for white passengers while the train was in motion and after the passenger had paid his fare.

The testimony of appellant tended to show that, on his refusing to leave the car where he was seated, he was violently assaulted and choked by the conductor into insensibility and was severely injured; that the conductor used abusive and profane language towards appellant; that the porter and brakeman also assaulted him. Appellant's testimony was corroborated by other witnesses.

The appellant presented the following prayer:

"7. If you find from the evidence that the plaintiff, John Bradford, took passage on defendant's train, and had a ticket to the place of destination, it was the duty of the conductor to furnish him with a seat, and, when assigned a seat, the conductor would not have a right to eject him from said seat to give it to another passenger; and if you believe from the evidence he was forcibly removed from said seat for the purpose of giving it to another, you are instructed that said ejectment was unlawful, and you should find for the plaintiff."

The court refused to grant the prayer, and appellant duly

excepted. The court gave, among others, the following instructions:

"20. You are instructed that it is the duty of the conductor in charge of a passenger train to assign the passenger to a coach or compartment of the coach to which they belong by virtue of the race to which they belong; and if the passenger refuses to occupy the coach or compartment to which he belongs because of his race, and occupies and insists and persists in occupying a coach or compartment to which he does not belong, because of his race, the conductor has the right to use such force as it is necessary to eject such a passenger from such a coach to which such a passenger does not belong."

The appellant objected to the instructions, and excepted to the ruling of the court in giving them. The verdict and judgment were for appellees. This appeal is duly prosecuted.

*T. C. Trimble, Joe T. Robinson* and *T. C. Trimble, Jr.,* for appellant.

Appellant being rightfuly in the car, the conductor had no right to eject him by force. 36 Wis. 465. The passenger may resist any attempt to remove him. 66 N. Y. 454; 143 U. S. 73; 67 Fed. 662; 95 Ia. 98. Plaintiff had the right to a seat, and it was the carrier's duty to furnish him one. Ray on Neg., 232-234; 53 Pa. St. 512. It is improper to ask a witness if he used due care, that question being for the jury. 101 Ill. App. 95; 200 Ill. 9; 20 O. Cir. 368. Witnesses should testify to facts, and not conclusions of law or fact. 24 Ark. 251; 13 Ark. 461; 66 Ark. 418; 70 Ark. 423. A brakeman cannot be asked whether certain acts are within the line of his duty. 84 Mo. App. 358; 146 Ind. 430; 13 Neb. 344; 94 Ala. 236; 74 Hun 202; 77 Hun 360; 4 La. Ann. 301.

*Kinsworthy & Rhoton,* and *Jas. H. Stevenson,* for appellee.

The verdict is sustained by the evidence. 74 Ark. 478. The conductor had the power to change the designation of coaches for the races. Kirby's Dig., § § 6622, 6624, 6627, 6628, 6629; 110 Ga. 771; 104 Ky. 431; 47 S. W. 344; 88 N. C. 542; 55 Pa. St. 205; 5 Mich. 520; 95 U. S. 485; 55 Ill. 187; 85 Tenn. 615; 38 Fed. 226.

Wood, J., (after stating the facts.) 1. The court in correct instructions presented to the jury the issues of fact as to

whether it became necessary for the conductor in the discharge of his duty to eject appellant from the smoker, and, if so, whether he performed his duty in a lawful manner, *i. e.,* without any unnecessary force, and without any insult or uncalled for humiliation to appellant. The verdict of the jury settles the disputed questions of fact in favor of appellee.

2. The controverted questions of law are presented in the refusal of the court to give appellant's prayer number 7 and in giving appellee's prayer number 20.

Prayer number 7 is predicated upon the theory that when once separate coaches or compartments are assigned respectively to the white and African races, and the passenger has been furnished a seat in the car or compartment set apart for the use of the race to which he belongs, thereafter the officers of the train could not make a new and different assignment of cars for the use of the separate races, and cause the passengers belonging to those races to adjust themselves accordingly. No warrant for such construction can be found in the provisions of the "separate coach law." Secs. 6622 to 6632 inclusive of Kirby's Digest. The purpose of the law was to require railway companies to provide "equal but separate and sufficient accommodations for the white and African races," for their mutual comfort and convenience. The law should be so construed to conserve the welfare of the public, white and colored, who use this mode of travel. If the rigid and narrow construction obtained as set forth in prayer seven, the inevitable consequence would be at times to greatly inconvenience and annoy both races. The case at bar aptly illustrates what might result constantly if the conductor, having supervision of the train and entrusted with the duty of securing as far as practicable the comfort of all the passengers, were not allowed, if the emergency demanded it, to reassign coaches for the different races, and to compel the passengers to take the coaches or compartments thus set apart for their use. Here, for instance, there was ample room for the comfortable seating of both races by the arrangement which the conductor ordered. But if appellant under the law could have retained his seat in the compartment first assigned to white people, and could have compelled the conductor to allow such assignment to stand, it would have resulted in great discomfort to a considerable number of the pas-

·sengers of both races. The lawmakers, having required equal but separate and sufficient accommodations for the white and African races, wisely left the matter of when and how the coaches and compartment should be designated and set apart to the good judgment of the companies, the only exaction being that provision should be made for the equal, separate and sufficient accommodation of the races named, and that the companies should compel the passengers to obey the requirements of the law by accepting and using the separate accommodations furnished them. The company has the right to make reasonable rules and regulations as to the times and manner of the designation and assignments of the separate compartments furnished under the law. To these the passengers must conform. It will be observed that the railway companies and the passengers have reciprocal duties and obligations looking to the due enforcement of the provisions of the "separate coach law." Railway companies' have the power, independently of any statute, to make reasonable rules for the separation of passengers belonging to different races, observing the conditions of equality of accommodations. Where the statute prescribes all the rules and regulations to be observed, of course, if these are reasonable, they must be observed. But where the statute is silent as to particular rules and regulations, the common-law right of the carrier to make them and have them obeyed remains unimpaired. 9 Current Law, p. 512, § 27; *Ohio Valley Ry. Co.* v. *Lander,* 104 Ky. 431, and authorities cited in brief of counsel in that case for appellant; 2 Hutchinson on Car., § 972, note 28. The court therefore did not err in refusing prayer number 7 and in giving prayer number 20. There were no reversible errors in the rulings of the court upon the admission of evidence. The judgment is therefore affirmed.